THE PEOPLE OF THE STATE OF NEW YORK, on the Complaint of HUGH A. NEWMAN, Plaintiff, *v.* THOMAS E. MURRAY, JR., Individually and as Receiver of INTERBOROUGH RAPID TRANSIT COMPANY, Defendant.

City Magistrates' Court of New York, Municipal Term, Borough of Manhattan, May 8, 1940.

*William C. Chanler, Corporation Counsel [Francis J. Bloustein* of counsel], for the People.

*James L. Quackenbush [J. Osgood Nichols* of counsel], for the defendant.

DeLuca, J. This is a prosecution under section 211 of the Sanitary Code of the City of New York, a misdemeanor, reading as follows:

" Sec. 211. Discharge of dense smoke prohibited. No person shall cause, suffer or allow dense smoke to be discharged from any building, vessel, stationary or locomotive engine or motor vehicle, place or premises within the City of New York or upon the waters adjacent thereto, within the jurisdiction of said City. All persons participating in any violation of this provision, either as proprietors, tenants, managers, superintendents, captains, engineers, firemen or motor vehicle operators or otherwise, shall be severally liable therefor."

The information charges that, between November 22, 1934, and June 12, 1935, the defendant permitted and allowed dense smoke to be emitted from a power plant operated and controlled by him as receiver of the Interborough Rapid Transit Company, duly

appointed by the United States District Court, Southern District of New York, and located on the west side of Eleventh avenue, between Fifty-eighth and Fifty-ninth streets, in the city of New York.

The ordinance under consideration is a municipal enactment under authority granted by the State.

A preliminary question to be determined is whether a receiver appointed by a Federal court can properly be prosecuted under a penal statute of the State, and if so, is such receiver one of the persons included within the prohibitions of section 211, quoted above.

Pertinent to the first branch of this question are the provisions of sections 65 and 66 of the Judicial Code (U. S. Code, tit. 28, §§ 124 and 125), as follows:

" Section 124. Management of property by receivers. Whenever in any cause pending in any court of the United States there shall be a receiver or manager in possession of any property, such receiver or manager shall manage and operate such property accord- to the requirements of the valid laws of the State in which such property shall be situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof. * * *

" Section 125. Suits against receiver. Every receiver or manager of any property appointed by any Court of the United States may be sued in respect of any act or transaction of his in carrying on the business connected with such property, without the previous leave of the court in which such receiver or manager was appointed; but such suit shall be subject to the general equity jurisdiction of the court in which such manager or receiver was appointed so far as the same may be necessary to the ends of justice."

The overwhelming weight of authority supports the view that Federal receivers are amenable to criminal prosecution in State courts. (People v. Joline, 65 Misc. 394; 2 Clark on Receivers, p. 1069; 15 A. L. R. p. 1372 and cases cited; State v. Wabash R. Co., 115 Ind. 466; 17 N. E. 909; Arkansas Central R. R. Co. v. State, 72 Ark. 250; 79 S. W. 773.)

The defendant relies upon the case of United States v. Murphy (44 Fed. 39) as authority for his contention that, as a Federal receiver, he cannot be held criminally responsible under a local statute. It is unnecessary to discuss this case in detail as it is clearly not in point. In fact, the opinion therein is authority for the proposition that the order of a Federal court is no protection to its receiver against a prosecution for a violation of any of the ordinary criminal statutes of a State.

Those few cases which seemingly hold that a Federal receiver is not answerable to prosecution under State or local law have been decided on the finding that the penal statute invoked was not broad enough in its terms to cover the acts of such receiver.

This leads us to consider whether or not section 211 of the Sanitary Code is applicable by its terms to a Federal receiver.

The statute is a public health measure and should be liberally construed. The first part of section 211 of the Sanitary Code of the City of New York states that " No person shall cause, suffer or allow dense smoke to be discharged " as therein stated. Whatever immunity defendant might have had against this statute by virtue of his being an appointee of a Federal court, is effectively taken away from him by the provisions of section 124 of title 28 of the United States Code, above quoted, and the decisions giving effect to such section. In the light of this section and such decisions, he must be considered as a person coming within the prohibition of this law which by its very language applies to any person. The fact that the term " receiver " is not used in the statute is not controlling. If such were the test to be applied, it would render inapplicable to receivers the provisions of nearly all of our criminal statutes because they are not specifically mentioned therein.

The remaining portion of section 211 states that " All persons participating in any violation of this provision, either as proprietors, tenants, managers, superintendents, captains, engineers, firemen or motor vehicle operators or otherwise, shall be severally liable therefor." Here again it is very clear that it was the legislative intent to include within the prohibition of the section all persons participating in the violation in any capacity. There is no necessity for the application of the doctrine of *noscitur a sociis*, advanced by the defendant; but if such doctrine were deemed applicable, it is equally clear that the term " receiver " is sufficiently associated with the term " managers," used in the statute, to be embraced within the phraseology " participating * * * either as * * * managers * * * or otherwise."

We now come to a consideration of the facts. The Interborough plant on Fifty-ninth street was erected in the year 1904 and at that time had a capacity of 71,250 K.w. By 1923 the capacity was increased to 225,000 K.w. Since that year to date there has been only a small increase in capacity to 265,000 K.w. The maximum load the plant has been called upon to produce at any time is 160,000 K.w. which leaves a considerable reserve. The peak loads on the plant are between eight and nine A. M. and five and six P. M. There are six smokestacks about 200 feet high with apertures from fifteen to twenty feet in width. Each of five stacks has twelve

boilers attached to it and four larger boilers connect with the sixth stack, making sixty-four boilers in all.

The plant consumes annually about 400,000 tons of semi-bituminous coal. Besides serving the Interborough lines, the plant furnishes power to certain trolley lines and the B. M. T. The furnaces are provided with mechanically operated underfeed stokers, which, by means of plungers, feed the coal into the bottom of the fuel bed which rests on sloping grates. A forced air draft is fed to the fire from underneath these inclined grates. In order to obtain more perfect combustion, some of the furnaces contain air nozzles which permit entrance of air over the fire.

Each boiler contains what is known as a Bailey combustion meter from which a boiler operator can tell at a glance whether there is the correct ratio between air and fuel in the furnace necessary for proper combustion.

Stacks 4, 5 and 6 contain photo-electric cell units which indicate the discharge of smoke in the stacks automatically. The apparatus throws a beam of light which traverses eighteen inches of smoke where it strikes a photo-electric cell connected with an automatic recording instrument in the boiler room, which records the smoke density. This unit also operates light signals, white, blue and red, for varying densities, in full view of the operators so that they may make the necessary adjustments.

In addition, the defendant employs a smoke observer, who is so stationed that he can at all times see all six stacks. When a stack smokes, he presses a button which operates a whistle in the boiler room, the number of blasts designating the number of stack which is smoking. If the smoke does not cease in two minutes, he operates the whistle again. After two minutes more, if the smoke continues, he causes a bell to be rung in the boiler room and at the same time presses a button which makes a record on a chart.

The People's case consisted of the testimony of two experienced sanitary inspectors of the department of health, a superintendent of a building in West Fifty-seventh street, and a teacher employed at a high school in the vicinity of the Interborough plant. One inspector testified that he made observations at the plant on ten different days between November 22, 1934, and June 12, 1935, and saw dense smoke being emitted from one or more stacks on each of those days. The periods ranged from one-quarter minute to fifty-three minutes continuously. On April 4, 1935, during an observation of one and one-half hours, he saw dense smoke coming out of four stacks intermittently for a total of fifty-eight minutes or about two-thirds of the period of observation. On this occasion it was discharged in large volumes which obscured the sky so that

you could not see through it. It sometimes made an opaque wall of smoke 100 feet wide out of four stacks; it ascended 100 feet and extended at least 400 feet while dissipating. It came out in curls which dropped and then rolled up. On June 12, 1935, dense smoke was emitted continuously from the most westerly stack for fifty-three minutes. It was described as very black, dense, heavy, thick and oily. It came out in heavy curls which came down the stack about thirty feet and curled up again, rising 100 feet and extending for several blocks before it was dissipated.

The other inspector told of his observations on four different days in March, April and May of 1935. On three of these days dense smoke came out for five-minute periods and on two of those occasions it continued after he ceased making his observation. On May 29, 1935, he saw dense smoke being emitted from four out of six stacks continuously for thirty-six minutes. The smoke on these occasions was thick, black, dense and oily and you could not see through it.

The building superintendent stated that he observed dense, black smoke nearly every day between November 22, 1934, and June 12, 1935, coming out of the westerly stack. It came two or three blocks easterly to his apartment house, at the same time dropping particles of dust.

The high school teacher stated that on every working day between November 22, 1934, and June 12, 1935, he saw clowds of dense, black smoke coming from the stacks and floating into the air. You could not see through the denser part of the smoke. Considerable soot came into his building, even through storm windows.

In addition to all this, it was developed during the trial that the defendant employs five or six men, working full time, to clean cinders from the roofs of neighboring buildings, extending four or five blocks in all directions, and that these men were working during the period embraced in the information herein. The defendant also supplied storm windows for some of the buildings in the vicinity.

Defendant advances the belief that in the application of section 211, proof of actual density of the smoke should be supplied and that evidence of density derived solely from visual observation is neither valid nor reliable. However desirable it might be to have some practical and scientific method of measuring the actual density of smoke under a statute which would prescribe permissible densities and maximum periods of emission, the fact is that we have no such statute under consideration here.

The term "dense smoke," as used in section 211 of the Sanitary Code, has always been construed as commonly understood and

not in the technical sense employed by engineers. (*Department of Health* v. *Ebling Brewing Co.*, 38 Misc. 537, 538, 539; *People* v. *N. Y. Edison Co.*, 159 App. Div. 786, 795.)

Our courts have affirmed numerous convictions where the evidence of dense smoke was based solely on visual observations by trained inspectors. The validity of such testimony has never been successfully challenged. Some of these cases are cited later on in this opinion for another purpose.

An appropriate definition of the term " dense smoke " appears in *Harmon* v. *City of Chicago* (110 Ill. 400): " Nor will any subtle distinctions be indulged as to what is meant by ' dense smoke,' as those terms are used in the ordinance. The terms used will be understood as commonly employed, and this court will understand by ' dense smoke,' precisely what everybody else does that has ever seen a volume of dark, dense smoke as it comes from the smoke-stack or chimney where common soft or bituminous coal is used in any considerable quantities." (Quoted with approval in *People* v. *New York Edison Company*, 159 App. Div. 786, at pp. 796, 797.)

The sanitary inspectors who testified for the People from visual observation were men of long experience in their work, excellently qualified to make reliable and accurate observations of dense smoke. In fact two of the defendant's expert witnesses testified that from the inspector's description they would say that what the inspectors observed was dense smoke and a serious smoke condition. Another of defendant's expert witnesses admitted that a trained observer could make a reasonably good guess as to both optical and physical density. There is no doubt that the People's witnesses saw dense smoke on the occasions to which they testified.

The defense attempted to show that everything was being done that was reasonably possible to control the smoke problem at the plant. It was claimed that the boilers and furnaces, though much smaller than those which would now be installed if the plant were rebuilt, could be operated as efficiently so far as smoke was concerned as those in the modern plants; that the stoker equipment, the Bailey meters and the photo-electric apparatus for measuring density are still standard equipment; that the man power employed was adequate and sufficient; that the plant was run efficiently and its capacity was adequate.

Many reasons were advanced by the defendant for the possible emission of dense smoke. A run of bad or wet coal might interfere with the proper operation of the stoker plungers, causing improper feeding and unbalanced consumption of the coal, which might cause a crack or hole in the fire bed with possible smoke. These con-

ditions, however, were admitted to be avoidable by careful watching of the fuel supply so as to get dry, selected coal of uniform characteristics. A crack or "bust" in the fuel bed or a sudden sliding down the inclined grate, known as an avalanche, were stated to be among the most common causes of excessive smoke; the formation of ash on top of the fuel bed and fresh coal displacing this ash could cause a puff of smoke. Much was made of the load conditions at the Interborough plant as a possible cause of smoke.

It is necessary to note at this point that none of these possible causes of dense smoke was offered as the specific cause of such smoke on the days mentioned in the information or bill of particulars, but rather as an exposition of the problem of dense smoke generally under the general defense of accident or unavoidability. The probability or even possibility of any one or more of these causes accounting for the conditions observed by the People's witnesses is entirely eliminated when we consider further the testimony of the defendant's own witnesses. They admitted that conditions resulting from arching over the coal, from holes in the fuel bed and sudden avalanches result only in puffs, lasting from ten to forty seconds; that even moist coal would not cause a continuous emission of smoke and that peak loads of demand for power should not cause smoke. Defendant's operating engineer stated that a smoke condition should be remedied in no more than one and one-half minutes. He could not conceive of anything except negligence which could cause dense smoke for the long periods testified to by the inspectors.

The evidence adduced by the defendant definitely establishes the fact that the Interborough plant can be operated without causing dense smoke, except possibly for an occasional puff at infrequent intervals. Practically every one of defendant's experts frankly admitted it. None denied it. One renowned expert cited the example of a plant within his knowledge, using pulverized bituminous coal which had eliminated dense smoke as a problem by good control of combustion conditions and averred that defendant's plant had substantially the same equipment and control methods. He stated that the defendant's plant with suitable coal and man power could be operated with substantially no smoke and that, if no accidents had occurred and smoke was emitted as described by the inspectors, the plant was not being operated efficiently. There is no evidence anywhere in the case that the smoke conditions during the period involved in this prosecution were due to accident.

The defendant introduced in evidence at the trial the charts showing smoke emission for the days at issue as recorded thereon

by the photo-electric apparatus previously mentioned. These charts are not complete records because they apply to stacks Nos. 4, 5 and 6 only. Stacks Nos. 1, 2 and 3 were not equipped with the photo-electric apparatus. Moreover, as to stack No. 6, the recorder never worked satisfactorily and the defendant's engineers at no time had confidence in it. On May 29, 1935, one of the days in issue, the apparatus for stack No. 5 was admittedly out of commission. This was probably the case on June 5, 11 and 12, 1935, also, because the charts for stack No. 5 on those days are missing.

Defendant's mechanical engineer in charge of economical operation admitted that these smoke chart records were not 100 per cent trustworthy but that this method of recording smoke density was the best they knew of.

The photo-electric apparatus in the stacks is so constructed that the light beam penetrates a swath of smoke only eighteen inches thick. When no rays of light can penetrate this eighteen inches of smoke, then only do you have 100 per cent density. Intermediate degrees of density are recorded by means of the photo-electric cell, depending upon the amount of light that reaches this cell through the smoke. This is concededly an arbitrary standard by which to measure density.

I have examined all of the smoke charts submitted by defendant. They do not constitute in any degree a refutation of the testimony of the People's witnesses regarding dense smoke on the days at issue. In fact, incomplete and unsatisfactory as they are, these records to my mind in many instances actually verify the accuracy of the observations made by the inspectors.

The sanitary inspectors made observations and saw dense smoke on fourteen different days, yet, strangely enough, defendant's smoke observer only recorded one of those days, to wit, June 22 1935, when he saw dense smoke. His record chart for that date showed that he had pushed the recording button nine times and that there had been dense smoke for twelve minutes. He did not testify on the trial. In view of all the other evidence in the case regarding dense smoke, I am satisfied that little reliance should be placed upon these smoke records.

Mention should be made of the matter of the installation of air jets or nozzles on the furnaces. Defendant's experts asserted that these nozzles reduced smoke emission from twenty-five to thirty per cent (one expert said from fifty to seventy-five per cent); that the cost of installation was about $700 per furnace and that it takes from one to two weeks to make one installation. By the year 1934 there were only twelve nozzles affecting the boilers on

stack No. 5, whereas there were sixty-four boilers in the plant and the first installation was started about the year 1931. At the time of the trial an additional twelve nozzles had been installed.

The installation of automatic combustion control would also reduce smoke. This together with air nozzles would reduce smoke about fifty per cent. While defendant's engineers knew about automatic combustion control nine years ago, it is only being installed now, at a cost of around $70,000.

It seems obvious that in regard to air nozzles and automatic combustion control, which are seemingly so effective in combatting the smoke problem, due diligence has not been shown.

The matter of coal tests made at the plant deserves some reference. Defendant purchases the coal consumed at the plant from numerous sources on open bids as called for by the rules of the transit commission. Although not required to do so by the commission, defendant tests all coal which is bought to determine its efficiency, a precaution, I should say, in the interest of economy. Each of these tests consumes about 1,400 tons of coal during four or five days in from eight to ten boilers. Twelve weeks yearly are spent testing coal. On such occasions the boilers are pushed harder than during periods of peak loads and irrespective of the load demands. To test motor efficiency and to see if the coal will operate satisfactorily under emergency as well as normal conditions, the boilers are run at an abnormally high rating. At such times it is admitted that more than average smoke is emitted. In fact, the defendant accounts for the excessive smoke on November 22, 1934, in stacks Nos. 4 and 5 by reason of such a test.

The defendant employs two chemists who examine all coal as to its quality with respect to smoke. Nevertheless, it is stoutly maintained that actual boiler tests such as described must necessarily be made to determine all of its characteristics under operating conditions at the plant where it is to be used.

I cannot subscribe to this contention. If the generation of dense smoke by all the power and industrial plants in the city of New York when making tests of coal comes within the category of unavoidable smoke, then we are indeed giving legal sanction to a smoke condition which would be a menace to the health and welfare of the inhabitants of the city. In this situation, economy and efficiency should be subordinated to the general welfare. The air drafts at defendant's plant are mechanically operated and controlled; they do not depend upon atmospheric conditions peculiar to that plant. It would seem reasonable to expect that coal tests could be made outside of New York city under conditions which duplicate those at defendant's plant. At any rate it rests with

science to devise satisfactory and efficient methods of testing coal which do not affect the general health.

I am thoroughly satisfied by the evidence herein that the defendant has violated the smoke abatement statute. Numerous convictions have been upheld in our courts for dense smoke emissions of much shorter duration and on fewer occasions where the evidence to support such convictions was not comparable to the strong and convincing evidence in the instant case. (*People* v. *Jones,* 164 App. Div. 894 [several five-minute periods]; *People* v. *Erickson,* 176 id. 910 [three minutes]; *People* v. *Staten Island Rapid Transit Co.,* 206 id. 675 [two or three minutes]; *People* v. *Wanamaker,* 222 id. 748 [several short emissions]; *People* v. *Brooklyn Edison Co.,* 250 id. 874 [one twenty-minute and one ten-minute emission]; *People* v. *New York Steam Corporation,* 278 N. Y. 617.)

The defendant seeks to bring himself within the doctrine first enunciated in the case of *People* v. *New York Edison Co.* (159 App. Div. 786) to the effect that the smoke ordinance does not apply where the emission of dense smoke is due to accident or is unavoidable. For many years following this case and in the decision of numerous cases which have since arisen, no allusion has been made to this principle until the recent case of *People* v. *Cunard White Star, Limited* (280 N. Y. 413). This latter case involved smoke emission, at sailing time, from a steamship engaged in foreign commerce. By a closely divided court, it was held that the defendant therein should not have been convicted for the discharge of dense smoke for a brief period under such conditions because it did not appear that it was avoidable by any means which were practicable. The People seek to confine the applicability of this case solely to situations involving steamships engaged in foreign commerce. They maintain that section 211, being a public health statute, should be applied literally as otherwise its effectiveness is lost. On the other hand, the defendant argues that this case has established a rule of reason in the interpretation of the scope and effect of the smoke abatement law; that he has reasonably explained the causes of the emission of dense smoke, and that from his point of view such emissions are unavoidable.

Assuming that the holding in the *Cunard White Star, Limited,* case is applicable to all cases of emission of dense smoke, in my opinion it cannot avail the defendant any, because there has been no showing of accident or unavoidability herein. The defense of accident was merely a recital of those accidental conditions which might possibly occur and account for the emission of dense smoke. No claim was made that the particular emissions forming the basis of this action were the result of these accidental conditions. The facts do not even justify the inference that such might be the case.

The plea of unavoidability is not substantiated by proof that on the days complained of dense smoke was unavoidable for certain definite reasons beyond defendant's control. Defendant insists that he has equipment as good as that in the modern plants; that the man power is efficient and adequate and that all reasonable precautions are being taken to avoid excessive smoke. If dense smoke is produced at the plant at times, and this he does not deny, but on the contrary admits, it is something which he claims is unavoidable. He is doing the best he or any one else can do. Here, again, the evidence belies this claim. It is unnecessary to repeat the evidence, given in some detail in an earlier part of this opinion, which shows clearly that accident or unavoidability do not explain the violations charged herein. The conclusion is irresistible that the defendant must be held accountable for them.

Accordingly, I find the defendant guilty of violating section 211 of the Sanitary Code of the City of New York.